IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-20107-1-JWL |
| | ) | |
| WILDOR WASHINGTON, SR. | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

# <u>MEMORANDUM AND ORDER</u>

On August 12, 2009, an Indictment was filed charging defendant Wildor Washington Sr. and Emma Jean Holmes with various federal offenses arising from an alleged scheme to purchase real estate using fraudulently obtained mortgages.  On February 26, 2010, a jury convicted Mr. Washington on four of these felony charges: conspiracy to defraud, wire fraud in violation of 18 U.S.C. § 1343, commercial carrier fraud in violation of 18 U.S.C. § 1341, and money laundering in violation of 18 U.S.C. § 1956.[1]  The matter is currently before the Court on Mr. Washington's Motion for New Trial (doc. # 99) and Motion for Judgment of Acquittal (doc. # 100).  As explained more fully herein, the Court denies Mr. Washington's Motion for New Trial.  As for Mr. Washington's Motion for Judgment of Acquittal, the Court grants the Motion as concerns

---

1 Mr. Washington was acquitted on a charge of lying to a federal investigator.

Mr. Washington's conviction for money laundering under 18 U.S.C. § 1956, but otherwise denies the Motion.

I. Factual and Procedural Background

*The Fraudulent Loan Applications*

The testimony at trial established that Mr. Washington acted as mortgage broker for Ms. Emma Jean Holmes' purchase of three residential properties in Johnson County, Kansas.[2] The loan applications submitted for the purpose of obtaining these residential properties contained inaccurate and false information. Each application required Ms. Holmes to disclose her annual income and to indicate whether she intended to use the property as her primary residence. It is undisputed that the applications each overstated her income and assets, and falsely indicated that she would use the property as her primary residence.[3] Mr. Washington's signature appeared on one of the loan applications, the application for property located at 7917 W. 155th Place, Overland Park, Kansas. At trial, Mr. Washington testified that he did not prepare the loan applications containing the false information, and that the one signature that appeared on a loan application for 7917 W. 155th Place was not his own signature, but rather a forgery. In furtherance of this defense, Mr. Washington presented evidence concerning a simultaneous mortgage fraud scheme conducted by Mr. Washington Sr.'s son, Wildor

---

2 Ms. Emma Jean Holmes was charged as co-defendant, but the trials were severed in order to avoid any issues with the admission of their respective testimony.

3 Kimberly Fine, a branch manager at BNC Mortgage, testified that a loan for a residence intended to be used as a primary residence generally has better terms than other types of loans, making it more advantageous to the borrower.

Washington, Jr. (Bill Washington, Jr.) and his girlfriend, Victoria (Ima) Bennett, a scheme which involved the use of forged signatures. For example, Mr. Washington introduced testimony Ms. Bennett provided as a witness in another criminal prosecution concerning the fraudulent scheme she engaged in with Bill Washington, Jr. Mr. Washington also pointed to evidence introduced concerning Ms. Bennett's role in the loan transactions with Ms. Holmes, contending that those involved in the Bill Washington, Jr.-Ima Bennett fraud scheme were responsible for the fraudulent signature appearing on the loan application.

However, during the course of an Internal Revenue Service investigation into these matters, Special Agent Henry Herron interviewed Mr. Washington, Sr.[4] Special Agent Herron testified that Mr. Washington admitted he had helped to prepare the loan applications for Ms. Holmes knowing that they contained false information concerning her financial status and her intent to live in the properties.[5] Agent Herron also testified that Mr. Washington admitted to signing the loan application for the property at 7917 W. 155th Place. At trial, Mr. Washington denied making these statements to Mr. Herron. Special Agent Herron also questioned Mr. Washington about whether Ima Bennett worked for Amstar Mortgage and Mr. Washington allegedly informed Mr. Herron that she did not in fact work for Amstar. For this statement, Mr. Washington was charged

---

4 Special Agent Herron testified that the interview occurred on August 25th, 2006.

[5] For example, with regard to Ms. Holmes' intent to live in the properties, Agent Herron testified that Mr. Washington told him this information was falsely placed on the loan application so that the lender would look favorably upon the loan and provide a better interest rate.

with making a false statement to a federal agent, in violation of 18 U.S.C. § 1001, a charge for which he was ultimately acquitted.

*The Association with Amstar Mortgage*

Yolanda Carrington owned a branch of Amstar Mortgage in the St. Louis metropolitan area, specifically Creve Coure. In April 2004, Mr. Washington, Sr.,[6] Bill Washington, Jr. Ima Bennett and other individuals ("the Washington group") travelled from Kansas City to St. Louis to discuss the possibility of the Washington group merging with and operating under Ms. Carrington's Amstar branch. However, corporate approval from Amstar was required in order for the Washington group to operate under the Amstar name. Ms. Carrington testified that she clearly expressed to the Washington group that they were not to close loans under the Amstar name until they received approval to do so, and that they never received such approval. Despite the fact they were not given permission to broker loans under the Amstar name,[7] the Amstar name appeared on two of Ms. Holmes's loan applications as the broker, and for all three transactions it was understood by the closing agents that the Washington's were operating as Amstar in providing broker services.

---

[6] Mr. Washington testified that he attended this meeting at the request of his son, Bill Washington, Jr.

[7] Ms. Carrington and Eugene Greer, Carrington's office manager, explained that the Washington group never received permission to operate under the Amstar name.

Ms. Holmes purchased three properties, in all of which James and Doris Moser had an ownership interest. Each was in foreclosure at the time of sale. The transactions are discussed in detail below.

1. The Property at 7917 W. 155th Place

In July 2004, Ms. Holmes purchased a home at 7917 155th Place, for $314,000. The original price for the property set forth in the real estate contract was $305,000, but on the day of closing, Ms. Holmes agreed to pay $314,000 instead, and she and the sellers signed an addendum to the contract providing for the change. National City Mortgage provided Ms. Holmes with the loan to purchase the property, and Denise Robinett of Kansas Secured Title served as the closing agent for the sale of the property. Mr. Washington's signature appeared on the loan application as the broker. The application also listed Amstar Mortgage in St. Louis, Missouri, despite the fact that Mr. Washington never received permission to broker loans under the Amstar name. However, Mr. Washington testified at trial that he never wrote a loan under Amstar. He also testified that he had neither assisted in the preparation of the application nor had signed the application.

Ms. Robinett testified that Ms. Holmes, Mr. Washington and Mr. Moser, the seller, were all present at Ms. Holmes' closing. She explained that the mortgage broker (Mr. Washington) is typically present at closing. However, she found Mr. Moser's

presence to be unusual, as the buyers and sellers typically sign the relevant documents at different times (i.e., there is a "buyer's closing" and a "seller's closing"). Moreover, she testified that she overheard Mr. Washington and Mr. Moser bickering about money at the closing. She also testified that she had Mr. Washington sign the loan application in her presence at closing. Mr. Washington denied having signed the loan application.

Ms. Robinett also explained that Mr. Washington did not receive a commission at closing on the sale, as would normally have occurred. Instead, he was required to pay the lender $1,962.50. Heritage Financial Investments, a company owned by Bill Washington, Jr., wrote a check to Kansas Secured Title for payment to the lender. However, the check was dishonored for insufficient funds, and the sellers instead agreed to pay the lender the money the broker owed. Ms. Robinett testified that she had the seller's promise to pay set forth in a written agreement because she found it unusual for the seller to offer to do so. Moreover, the sellers received nearly $40,000 from the sale of the property despite the fact that the property was in foreclosure.[8]

## 2. The Property on Birch Street

In September 2004, Ms. Holmes purchased a home on Birch Street, for $360,000. People's Choice Home Loan, Inc. provided Ms. Holmes with the loan to purchase the property, and Denise Robinett again served as the closing agent. Thomas Carlson's signature appeared on the loan application as the broker. Off to the side, the application

---

[8] James and Doris Moser received $39,490.34.

listed as his employer Amstar Mortgage, in Leawood, Kansas.  Ms. Carrington and Mr.

Greer each testified that they were not aware of an Amstar branch located in Leawood,

Kansas.  Mr. Carlson was not present at closing, and Ms. Robinett testified that she did

not know him.  She explained that she had worked on the sale with "Amstar," represented

by Washington Jr. and Washington Sr.[9]  At trial, she could not recall whether or not Mr.

Washington Sr. was present at the sale of the Birch property, although she stated was

quite sure he had been present at the closing for the property at 7917 W. 155th Place.[10]

Ms. Robinett also testified that the Washingtons, operating as Amstar, received $4,329 on

the sale.[11]  Although the property was in foreclosure, the Mosers again received nearly

$40,000 from the sale.[12]

---

[9] Special Agent Herron testified that he had asked Mr. Washington Sr. whether he knew a Thomas Carlson, and that Mr. Washington had denied having any knowledge of him.

[10] Ms. Robinett initially stated that Mr. Washington had been present at the second closing, but she quickly corrected herself.  While Ms. Robinett was explaining which individuals were present at the Birch closing, the following exchange occurred:

> Q: And anyone else?
> A: Mr. Washington

Q: You say Mr. Washington.  Are you referring to Bill Washington Sr. or Bill Washington Jr.?
A: Bill Washington Sr., but can I look at my file a second, please?
Q: Would that help you refresh your recollection?
A: Please.
Q: Sure.
A: I need to correct something, please.
Q: Yes, ma'am.
A: Definitely at the second closing Ms. Holmes was present.  I can't honestly say if Mr. Washington Sr. was at this closing.

Not soon afterwards, Ms. Robinett stated: "I know he was definitely there at the first closing.  I honestly can't say if he was there at the second."

[11] This amount included $9 for a credit report.

During the closing on this property, Kansas Secured Title drafted a check payable to South and Associates, a law firm representing the lender of the sellers, for $312,617.80, to pay off the mortgage incurred by the sellers, as well as foreclosure costs. This check was paid from the proceeds of the loan obtained by Ms. Holmes. The government charged Mr. Washington and Ms. Holmes with money laundering in connection with this financial transaction.

Ms. Robinett testified that the lender for the sale of this property required as a condition of the loan that the closing documents be sent to the lender immediately after closing.[13] Pursuant to her usual practice, Ms. Robinett sent the closing documents to the lender via FedEx Priority Overnight, after the closing on September 9, 2004. Ms. Robinett also testified that it was standard industry practice for the loan documents to be sent back to the lender overnight in order for the lender to have them right away. At every closing, these documents would be immediately sent back to the lender. The transmission of these closing documents to the lender formed the basis of the commercial carrier fraud charge of which the jury found Mr. Washington guilty.

---

[12] They received $39,954.62 for the sale of the Birch property.

[13] Ms. Robinett explained that the lender would permit the loans to be disbursed prior to the final, signed documents being mailed back to the lender, but that it was nonetheless an integral, necessary step in the loan process.

3.  The Property at 7864 W. 155th Place

In September 2004, Ms. Holmes purchased a home at 7864 W. 155th Place, for $365,000.[14]  BNC Mortgage provided Ms. Holmes with the loan to purchase the property, and Colleen Asmus of Missouri Secured Title[15] served as the closing agent for the sale of the property.[16]  Yolanda Carrington's signature appeared on the loan application as the broker.  However, Ms. Carrington testified at trial that this signature had been forged.  Her office manager, Eugene Greer, likewise testified that it was not her signature on the application.

This application listed Premier Mortgage Funding next to Ms. Carrington's name as the employer, but Ms. Carrington and Mr. Greer each testified that Ms. Carrington was still associated with Amstar Mortgage on the date the application was completed.  Ms. Asmus stated that she did not know Ms. Carrington and that she was not present at closing.  She had received the loan application already signed.  Ms. Asmus explained that she understood Amstar Mortgage to be the broker, and that she worked with Mr. Washington, Sr. and his "assistant," Ima Bennett, on the sale of the property.[17]  She

---

[14] The sellers of this property included Robin and Leanna Williams, and James and Doris Moser.

[15] Kansas Secured Title and Missouri Secured Title were affiliated companies operating on different sides of the state line.

[16] Closing on this property occurred in Liberty, Missouri, although the property was located in Kansas

17 She stated that she did not work with Bill Washington, Jr. on the transaction.

testified that Mr. Washington was present at closing as the broker. She additionally testified that Amstar had been listed as the broker on a HUD-1 form that had been filled out. As with the other properties, the sellers received money from the sale despite the foreclosure status of the property.[18]

In the course of attempting to close on the loan, Ms. Asmus faxed a title commitment[19] and invoice from her office in Missouri to Ima Bennett in Kansas, at (913)-814-0467. She faxed it to Ms. Bennett as a representative of Amstar. She explained at trial that this was necessary for the transaction, because the title company could not issue a title policy without the title commitment, and the lender required a title policy with any loan it provided. The faxing of this title commitment and invoice formed the basis of a wire fraud charge.

## II. Standards

Mr. Washington moves for a new trial, alleging a violation of the government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33. "A motion for a new trial is not regarded with favor and is only issued with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir.2007) (citing *United States v. Trujillo*, 136 F.3d 1388,

---

18 For the sale of this property, the Mosers received $5,000.

19 Ms. Asmus explained that a title commitment lists who owns the property and whether there are mortgages on the property, and provides important information concerning the buyer and seller.

1394 (10th Cir.1998)).  The decision whether to grant a motion for new trial is committed to the sound discretion of the trial court. *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir.1992).

As for Mr. Washington's motion for judgment of acquittal, the Court must uphold the jury's verdict of guilty if "'any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'"  *United States v. Urbano*, 563 F.3d 1150, 1156 (10th Cir.2009), *cert. denied*, 130 S.Ct. 434, 175 L.Ed.2d 297 (2009) (quoting *United States v. Doddles*, 539 F.3d 1291, 1293 (10th Cir.2008)).  The court must "'ask only whether taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'"  *United States v. Erickson*, 561 F.3d 1150, 1158 (10th Cir.2009), *cert. denied*, 130 S.Ct. 173, 175 L.Ed.2d 109 (2009) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir.1999)).  "'While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.'"  *Erickson*, 561 F.3d at 1158-59 (quoting *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008), *cert. denied*, 128 S.Ct. 2979, 171 L.Ed.2d 902 (2008)).

III.  Analysis

A.  Motion for New Trial

In order to establish a Brady violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.  *United States v. Combs*, 267 F.3d 1167, 1172 (10th Cir .2001) (citing *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999)).  The government argues that the defendant is not entitled to a new trial both because (1) the suppressed evidence could not have been used to impeach and therefore was not favorable to the defendant and (2) the evidence was not material.  The Court concludes that the evidence was not material and, as a result, denies the defendant's Motion for New Trial.

1.  Suppression of Evidence

The government concedes that the relevant evidence had been suppressed by the government, albeit inadvertently.  According to the government, a special agent for the Department of Housing and Urban Development (HUD) spoke with two of the prosecution's trial witnesses, Denise Robinett and Colleen Asmus, and documented these discussions in reports subsequently prepared.  The reports were not provided to Mr. Washington prior to trial, apparently because the prosecution was not aware of their existence until after the trial had concluded.  These reports form the basis for Mr. Washington's *Brady* claim.   However, the government concedes the irrelevance of its

lack of knowledge concerning the existence of the reports, and the Court likewise

recognizes that the suppression element of Mr. Washington's *Brady* claim has been

satisfied. *See Smith v. Sec'y of New Mexico Dept. of Corr.*, 50 F.3d 801, 823 (10th Cir.

1995).

2.  Favorable Evidence

The second part of *Brady* "requires proof the evidence in question was

exculpatory, or favorable, to the defendant." *Id*. at 825. Evidence that could be used to

impeach a trial witness also falls within *Brady*. *See United States v. Headman*, 594 F.3d

1179, 1183 (10th Cir. 2010). According to Mr. Washington, the HUD special agent's

report concerning the interview with Ms. Robinett could have been used to impeach her

testimony at trial and therefore qualifies as "favorable" evidence that the government was

obligated to disclose.

In the report, the special agent documented Ms. Robinett as having stated during

the interview that Mr. Washington and James Moser, the seller, spoke by telephone at the

"closings." At trial, however, Ms. Robinett testified that both Mr. Washington and Mr.

Moser were at Ms. Holmes' closing, explaining that she found this unusual. In addition,

she testified that Washington had been "bickering" with Mr. Moser about money at the

closing. She also stated that Washington had signed the loan application for the purchase

of the relevant property at the closing itself.

Mr. Washington contends that the special agent's report could have been used to impeach Ms. Robinett's trial testimony that both Mr. Washington and Mr. Moser were present at the closing. However, the government asserts that the information contained in the report would not actually have provided the defendant with an inconsistent statement to impeach Ms. Robinett, emphasizing the particular language used in the report. The report specifically states as follows:

> Robinett had a bad feeling about James Moser, seller, and felt he was trying to do things that were not right. The two loans she processed with Moser as seller, 7917 W. 155th Pl. and 15718 Birch, Overland Park, Kansas, seemed strange to her in that Moser would always be on the cell phone with Washington. In her experience, it is very unusual for the seller to be on the phone with the buyer's loan officer. Moser was on the phone with Washington during his closings and again if he came to pick up his proceeds check. Robinett got the impression they were in cahoots with one another. Robinett was uncomfortable with closing Moser sales and ended up telling Moser to take his business elsewhere.

Under Mr. Washington's interpretation of this language in the report, Ms. Robinett stated during the interview that Washington and Moser were conversing over the phone during the *buyer's* closing. As they could not have both been at the buyer's closing if they were on the phone with one another, this prior statement from Ms. Robinett could impeach her trial testimony. As Mr. Washington has asserted, if they were speaking telephonically, Ms. Robinett might not have been privy to their conversation at all, let alone have known whether they were bickering about money. Moreover, Mr. Washington gleans from the report that it may have been Mr. Moser rather than Mr.

Washington who was present at the closing.[20]  If so, Mr. Washington would not have signed the loan application in Ms. Robinett's presence, as she had testified.  According to Mr. Washington, these inconsistencies, coupled with other difficulties in recollecting the specifics of the transactions, would have led the jury to find her testimony suspect.

The government interprets the language differently.  Ms. Robinett testified at trial that there are two closings for such real estate transactions: a buyer's closing and a seller's closing.  The report actually stated that Moser was on the phone with Washington during *his closings*, and the government interprets this to mean that they were on the telephone during Mr. Moser's closing (i.e. the seller's closing).  Thus, they could still have both been present at the buyer's closing, the closing at which Ms. Robinett testified Mr. Moser and Mr. Washington were both present.

After consideration of the government's arguments, the Court nonetheless concludes that the special agent's report can be categorized as "favorable" evidence under *Brady*.  The report would have provided Mr. Washington with a basis to attack the credibility of Ms. Robinett during cross-examination, regardless of how the jury might ultimately have viewed the statement contained in the agent's report.  Thus, the Court finds this element satisfied as well.

---

[20] Mr. Washington states in his Motion for New Trial: "[the] HUD agent's report seems to indicate, although it is less than clear-that Moser-not Washington-was physically present at the closing or closings.  The report implies that Moser placed the telephone calls from Robinett's office during the closings.  In turn, that means Washington would not have been there and would not have signed the loan application in Robinett's presence."

3. Material Evidence

The third part of a *Brady* claim "requires proof that the evidence was 'material either to guilt or to punishment.'" *Combs*, 267 F.3d at 1175 (citing *Smith*, 50 F.3d at 826). "'A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *Smith*, 50 F.3d at 826 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). Evidence is therefore material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir.1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In light of the evidence presented at trial, the Court agrees with the government that the statements contained in the special agent's report would not have produced a different result in this case. First, if the defendant cross-examined Ms. Robinett concerning the statement in the report in order to impeach her credibility, Ms. Robinett's memory likely would have been refreshed as to other incriminating details contained in the report about which Ms. Robinett had not testified.[21] Second, the statement in the report concerning Mr. Washington and Mr. Moser speaking telephonically relates to details of the transactions which would not have had any noteworthy impact upon the

---

[21] In particular, the report stated that Ms. Robinett faxed to Amstar a copy of the proceeds check "she provided to Washington to hand carry to Amstar." As the government has pointed out, this information would have provided a means of establishing through direct evidence that Mr. Washington directly received proceeds from the fraudulently obtained loans.

jury's ultimate conclusion of guilt, particularly in light of the other overwhelming evidence presented at trial, such as the evidence of Mr. Washington's admissions to Special Agent Henry Herron.  Regardless of whether they were speaking telephonically or in person at the closings, Ms. Robinett considered their behavior unusual and the transactions consequently suspect.  Third, the testimony of Ms. Robinett was corroborated by other testimony presented at trial.  In particular, Agent Herron testified that Mr. Washington stated to him that he helped Ms. Holmes with her loans, including signing the application for the property at 7917 W. 155th Place,  and knew that the information contained in the loan applications was inaccurate in that Ms. Holmes' income was overstated and that she would not be using the homes as a residence.  Moreover, significant testimony concerning the alleged conspiracy to defraud was presented by Ms. Carrington, Mr. Greer, and Ms. Asmus.  Therefore, the Court concludes that the materiality requirement of *Brady* has not been satisfied, and the Court consequently denies Mr. Washington's Motion for New Trial.

B.  Motion for Judgment of Acquittal

    In his Motion for Judgment of Acquittal, Mr. Washington asserts that the government presented insufficient evidence to support his conviction on any of the counts.  Mr. Washington asserts this argument generally as to all counts, and then presents two specific arguments concerning his convictions for common carrier fraud and for money laundering.  The Court will therefore address in turn the evidence presented

for the charges of conspiracy and wire fraud and then the merits of Mr. Washington's legal arguments concerning common carrier fraud and money laundering.

1. Conspiracy

Count 1 of the Indictment charged Mr. Washington with conspiring to commit wire and commercial carrier fraud, in violation of 18 U.S.C. § 371. To obtain a conviction for conspiracy under 18 U.S.C. § 371, the government must prove (1) the defendant's agreement with another person to violate the law; (2) the defendant's knowledge of the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *United States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000). "Simply stated," the government had to prove that Mr. Washington had "an explicit or implicit agreement with [his coconspirators]" to commit wire and common carrier fraud. *Id. See also United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006).

"To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004), *vacated on other grounds by Lang v. United States*, 543 U.S. 1108 (2005)). "Although 'mere association' with conspirators is insufficient to support a conspiracy conviction, 'frequent contacts' among conspirators and 'their joint appearances at transactions and negotiations' tend to show the existence of an

agreement." *United States v. Aragon*, 141 F.3d 1186, 1998 WL 166059, at *3 (10th Cir. Apr. 10, 1998) (table op.) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir.1992)); *see also United States v. Kelley*, 187 Fed.Appx. 876, 884 (10th Cir.2006) ("Although no government witness testified about an express agreement between [the co-defendants], the prosecution presented ample evidence to allow the jury to infer reasonably that such an agreement existed."). Under the essential objective element, "the government must prove that the alleged conspirator had a general awareness of both the scope and the objective of the enterprise." *Pulido-Jacobo*, 377 F.3d at 1130 (quoting *Evans*, 970 F.2d at 670). A jury may presume that "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir.1994); *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir.1997). "Interdependence exists where each coconspirator's actions constitute essential and integral steps toward the realization of a common, illicit goal." *Pulido-Jacobo*, 377 F.3d at 1131 (quoting *Carter*, 130 F.3d at 1440).

Mr. Washington generally challenges whether the government presented sufficient evidence to convict him of conspiracy to defraud, without specifying any particular element he believes the government failed to establish. Nonetheless, the Court has considered the evidence presented by the government and concludes that there existed considerable evidence from which the jury could reasonably have found Mr. Washington was a member of the conspiracy charged. First, Special Agent Henry Herron testified that Mr. Washington admitted to him that he had knowingly assisted Ms. Holmes in

preparing loan applications which he knew to contain false information. For example, Mr. Herron testified that Mr. Washington explained to him that they had purposely marked on the applications that each would serve as Ms. Holmes' primary residence, despite the fact that she never intended to live in any of the homes, in order to make Ms. Holmes appear a more desirable borrower to the lender and thus induce the lender to offer Ms. Holmes better loan terms. Mr. Herron also testified that Mr. Washington admitted to having signed the loan application for the property at 7917 W. 155th Place. From this testimony, the jury could reasonably conclude that Mr. Washington had agreed with Ms. Holmes to participate in a scheme to defraud within the meaning of the mail and wire fraud statutes. But the government also presented additional evidence from which the jury could infer such an agreement. The government presented testimony from the closing agents for each of the properties, Ms. Robinett and Ms. Asmus, concerning the suspect nature of the transactions and Mr. Washington's primary role in them. For example, Ms. Robinett testified about her apprehensions concerning the transactions with Ms. Holmes and Mr. Washington, explaining that she found certain aspects of the transactions highly unusual. For example, with regard to the property at 7917 W. 155th Place, she discussed how odd it was for the seller to have been present at the buyer's closing and for the seller to have offered to pay the broker's obligations to the lender. Ms. Robinett also testified that she personally witnessed Mr. Washington signing the loan application, as she had requested that he do so at the closing on that property. Moreover, Ms. Robinett explained that she had worked with Mr. Washington on the sale of the Birch property and understood him to be the broker, despite any indications on the loan

application to the contrary.  Lastly, with respect to the property at 7864 W. 155th Place,

Ms. Asmus testified that she understood Amstar Mortgage to have been the broker and

that she worked with Mr. Washington on the sale.  There was therefore considerable

evidence for the jury to have concluded that Mr. Washington assisted Ms. Holmes in

preparing the fraudulent loan applications for the properties in question, and for the jury

to infer that he did so knowingly and voluntarily.  Thus, the Court denies Mr.

Washington's Motion for Judgment of Acquittal on Count 1 of the Indictment on the

basis of insufficient evidence.

2.  Wire Fraud

The government charged Mr. Washington with wire fraud in connection with the

sale of the property at 7864 W. 155th Place.  To establish that Mr. Washington committed

wire fraud, the government had to prove: (1) Mr. Washington engaged in a scheme to

defraud; (2) he did so with the intent to defraud; and (3) use of interstate wire or radio

communications to execute the scheme.  *See United States v. Lewis*, 594 F.3d 1270, 1274

(10th Cir. 2010).  *See also United States v. Wittig*, 575 F.3d 1085, 1093 (10th Cir. 2009).

As explained in detail above, from the testimony given by Special Agent Herron, as well

as Ms. Robinett and Ms. Asmus, the jury could readily conclude that Mr. Washington

was involved in a scheme to defraud with the requisite intent.[22]  Moreover, the

government presented undisputed evidence that there was use of  interstate wires to

---

[22] Mr. Washington was also charged under 18 U.S.C. § 2 and may be deemed to have aided and abetted in the wire and common carrier fraud, making him as responsible as the "principal," Ms. Holmes.  See 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.")

execute this scheme. In particular, Ms. Asmus testified that she faxed a title commitment and invoice from her office in Missouri to Ima Bennett in Kansas, in Ms. Bennett's purported capacity as a representative of Amstar Mortgage. Moreover, Ms. Asmus explained that the faxing of a title commitment was a necessary step in the loan process, as the lender required a title policy, which the title company could issue only with a title commitment. As this was an ordinary, expected step in the loan process, the Court concludes that the government presented sufficient evidence of "causation" under the wire fraud statute: that Mr. Washington had knowledge that the use of an interstate wire would follow in the ordinary course of business, or that such a use could at least reasonably be foreseen, whether or not actually intended. *See United States v. Maze*, 414 U.S. 395, 399 (1974) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). Consequently, the Court finds that the government presented sufficient evidence for the jury to reasonably conclude that Mr. Washington committed the offense of wire fraud with respect to the property located at 7864 W. 155th Place.

3. Common Carrier Fraud

A conviction under the mail fraud statute for what was described at trial as common carrier fraud required the government to establish: (1) the devising of a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations or promises; (2) the specific intent to defraud; and (3) the use of the United States mails or a commercial carrier to execute the scheme. See *United States v.*

*Kennedy*, 64 F.3d 1465, 1475 (10ᵗʰ Cir. 1995).  *See also* U.S.C. § 1341 (1994). [23] As with

the other charges, Mr. Washington challenges generally the sufficiency of the evidence

the government presented to support his conviction.   However, Mr. Washington also

asserts more specifically that the government has not presented sufficient evidence that

the use of a commercial carrier was in execution of the scheme to defraud, as required by

*United States v. Maze*, 414 U.S. 395, 403 (1974).   The charge of commercial carrier fraud

was predicated upon the closing agent's sending by FedEx certain closing documents

relating to the sale of the Birch property.   Denise Robinett, the closing agent for the

Birch property, testified at trial that she sent signed documents to People's Choice Home

Loan, Inc., the lender for the Birch property, subsequent to the closing.   In a manner

consistent with her usual business practice, she sent these via FedEx, a commercial

carrier.   Mr. Washington contends that the scheme had reached fruition when Ms.

Holmes received the loan money and title to the property and that the subsequent sending

of the closing documents therefore could not have been in execution of the scheme to

defraud.[24]

To support a separate conviction for common carrier fraud, the government

presented the testimony of Ms. Robinett, the closing agent for the sale of the Birch

property who actually used FedEx for the purpose of transmitting the closing documents

to the lender pursuant to the loan agreement.   Ms. Robinett explained that it was a

---

[23] The indictment alleges that the closing documents were sent by FedEx, a common carrier, rather than through
the United States Mail.

[24] The legal standards for mail fraud are applicable.

standard policy within the loan industry for the signed closing documents immediately to be sent overnight to the lender after closing occurred. She testified that the transmission of these documents was a necessary step in the loan process, since the lender required it as a condition of the loan. Thus, as with the charge of wire fraud, the use of a common carrier in execution of the scheme was certainly a foreseeable consequence, regardless of Mr. Washington's ultimate intent. *See Maze*, 414 U.S. at 399 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). Moreover, the government presented evidence that Ms. Robinett sent the documents to the lender via FedEx Priority Overnight subsequent to the closing on September 9, 2004. Ms. Robinett not only testified to this effect, but the government also admitted into evidence the FedEx shipping label. Thus, aside from the issue of whether the use of FedEx was in execution of the scheme to defraud, the Court finds the government presented sufficient evidence for the jury to reasonably conclude that Mr. Washington committed the offense of common carrier fraud.

The Court thus turns to the question of whether transmitting the documents after Ms. Holmes received the loan and title to the property could still be deemed to be in execution of a scheme to defraud. A mail fraud conviction requires not only that the defendant "caused" the mails, or a common carrier, to be used, but also that the transmission was "sufficiently closely related" to the scheme to defraud. *Maze*, 414 U.S. at 399. Thus, "the mailing must be 'for the purpose of executing the scheme.'" *Id*. at 400 (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)). To satisfy this "purpose" requirement, the transmission must be "'part of the execution of the scheme as conceived

by the perpetrator at the time.'" *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir.

2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989). However, the

scheme need not "'contemplate the use of the mails as an essential element.'" *Maze*, 414

U.S. at 400 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). As the 10th Circuit

has explained: "[t]he defendant need not have made the transmission personally, merely

caused it to be made. It need not be at the heart of a scheme, nor necessary or even

helpful for its success; it need not itself be false or deceptive." *Redcorn* at 738. Rather, it

will be considered to be for the purpose of furthering a scheme to defraud if "'the

transmission is incident to the accomplishment of an essential part of a scheme.'" *Id.*

(quoting *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989)).

Generally, a transmission occurring after the scheme has reached fruition cannot

be considered to play an essential role in the fraudulent scheme. *See Redcorn*, 428 F.3d

at 741 (explaining that, "as a general proposition," use of the mails or wire after the

scheme has reached fruition "will not constitute grounds for a conviction") (quoting

*United States v. Taylor*, 789 F.2d 618, 620 (8th Cir. 1986)). As discussed in further detail

below, there are exceptions to this general rule, yet the timing of the transmissions still

retains significance and therefore it must be determined when the scheme was complete.

Here, the indictment stated that the purpose of the scheme was to obtain home loans by

submitting false and fraudulent loan applications, in order to enrich the perpetrators. If

the fraudulent scheme was to procure the loans, then the scheme reached fruition only

once all the requirements for obtaining the loan were satisfied. Although Ms. Holmes

received the loan money and title to the property before the mailing occurred, Ms. Robinett testified that one of the requirements of the loan was the sending of the closing documents to the lender afterwards. Consequently, not all of the loan requirements were satisfied when Ms. Holmes received the loan money and title to the property. Rather, per the agreement, the "loan" was complete only once the documents were sent and it was at this point that the scheme reached fruition. *See United States v. Fiorito*, 2009 WL 3064752, at * 6 (D. Min. Sept. 22, 2009) (slip copy) (concluding that a mortgage fraud scheme had not reached fruition before the required mailing of HUD-1 forms, which occurred after the closings).

As the closing documents were required to be sent in order for the loan to be obtained, the transmission of the documents would have been "contemplated from the outset by a participant in the scheme as a necessary step." *See United States v. McDougal*, 137 F.3d 547, 555 (8th Cir. 1998). Similarly, in *McDougal*, the defendant had obtained a Small Business Administration loan, having misrepresented the purpose of the loan, and asserted that the mailing of a Form 1031 to the Small Business Administration subsequent to receiving the loan money could not form the basis of a mail fraud charge. *Id.* at 555. She argued that the scheme reached fruition when she received the loan money and the mailing therefore could not have been in execution of the scheme. *Id.* The Eighth Circuit concluded that it was in execution of the scheme, explaining that the government had presented evidence that the mailing was "part of the scheme from the outset." *Id.* There was testimony, for example, that the Form had to be sent in to

demonstrate the propriety of the loan to the Small Business Administration, and that the Form was part of the documentation prepared during origination of the loan and present at closing for review. *Id.* Mailing the form was necessary to permit the perpetrator to "retain the fruits of [the] fraud"—it was a required step in the process, and thus would have been contemplated by the perpetrator from the outset. *Id.* Likewise, Mr. Washington and Ms. Holmes would have viewed Ms. Robinett's transmission of the closing documents as a necessary step in the process of obtaining the loans by fraudulent means. As a result, the use of the common carrier was part of the execution of the scheme to defraud as the perpetrators conceived it. *See also Fiorito*, 2009 WL 3064752, at * 6 (finding that the mailing of HUD-1 forms after closing was "incident to an essential part" of a mortgage fraud scheme, noting that "the lender would have caused problems for the title company if the lender had not promptly received a signed HUD-1").

In addition, the use of FedEx may be deemed in furtherance of the scheme even if the scheme was complete upon Ms. Holmes receiving the loan money and title to the property. Transmissions occurring after completion of a fraudulent scheme may still be considered to be in execution of the scheme if "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Maze*, 414 U.S. at 403. *See also United States v. Lane*, 474 U.S. 438, 451-52 (1986). Here, the sending of closing documents via FedEx to the lender after closing lulled the lender into a false sense of security regarding the soundness of the loans. Had the

documents not been sent as required, the lender may have been alerted to the possibility of fraudulent activity. *See Lane*, 474 U.S. at 453 (concluding that the mailing of proof-of-loss forms after receipt of insurance payments lulled the insurer into a false sense of security because the insurer might otherwise have discovered the fraud). Thus, the government presented sufficient evidence that Mr. Washington caused the transmission of the closing documents via a common carrier for the purpose of executing the scheme to defraud.

Mr. Washington cites to two primary cases in support of his assertion that the use of FedEx to send the closing documents was not in furtherance of the fraudulent scheme, *United States v. Maze*, 414 U.S. 395 (1974) and *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008). In *Maze*, the defendant stole a credit card and used it to obtain lodging at various motels. *Maze*, 414 U.S. at 396. The motels forwarded sales invoices to the cardholder's bank, and the bank then mailed them to the victim for payment. *Id.* at 397. These mailings formed the basis for mail fraud charges. The Supreme Court concluded that the mailings were not in execution of the scheme to defraud, as the scheme reached fruition when the defendant checked out of the motels and the subsequent mailings were merely for the purpose of settling accounts among the motels, the bank, and the cardholder. *Id.* at 401-02. As the scheme had reached fruition at the time of the mailings, the mailings were not sufficiently related to the scheme to fall within the scope of the mail fraud statute. In *Redcorn*, a corporate executive transferred embezzled funds into a private bank account and then to his out-of-state investment broker. *Redcorn*, 528

F.3d at 731-33. The final transfer to the broker formed the basis for a wire fraud charge. The Tenth Circuit concluded that the scheme had reached fruition when the defendant transferred the money into his personal account, and that the subsequent transfer to the broker therefore was not in execution of the scheme to defraud. *Id*. at 742.

*Maze* and *Redcorn* are both distinguishable in that Mr. Washington and Ms. Holmes were required to send the closing documents to the lender in order to obtain the loan, regardless of the fact that this was to occur after the loan money had been disbursed. As this was a requirement to obtain the loan, the post-closing mailing would have been contemplated by Mr. Washington and Ms. Holmes at the time that they sought to obtain the loan. Moreover, in both *Maze* and *Redcorn*, it was noted that the transfers were not for the purpose of concealing the fraudulent activity. *See Maze*, 414 U.S. at 403 (explaining that the mailings were not intended to lull the victims into a false sense of security or postpone detection because the mailings from the motel owners to the bank actually increased the likelihood of detection) and *Redcorn*, 528 F.3d at 741-42 (noting that no evidence had been presented that the wire transfers were necessary to conceal the fraud and pointing out that the transfers actually made the fraud even more obvious). Thus, neither *Maze* nor *Redcorn* compel a different result than that which the Court reaches.

4.  Money Laundering

The government charged Mr. Washington with money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), "which is aimed at money laundering which promotes the carrying on of an unlawful activity."  *U.S. v. McIntosh*, 124 F.3d 1330, 1335-36 (10th Cir. 1997). Section 1956(a)(1)(A)(i) provides in relevant part:

>  (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity…
>
> shall be sentenced to a fine…or imprisonment…

The government claims that Mr. Washington violated this provision with respect to the real estate transaction concerning the Birch property.  To establish Mr. Washington's guilt under this provision, the government had to prove beyond a reasonable doubt that he (1) conducted or attempted to conduct a financial transaction; (2) which he knew involved the proceeds of unlawful activity; (3) with the intent to promote or further unlawful activity.  *United States v. Torres*, 53 F.3d 1129, 1136 (10th Cir. 1995) (quoting *United States v. Puig-Infante*, 19 F.3d 929, 937 (5th Cir. 1994).

In addition to asserting that the government presented insufficient evidence to convict him of this charge,[25] Mr. Washington presents two distinct legal challenges to his

---

[25] At trial, Ms. Robinett did testify as the closing agent for the Birch property that a check had been drafted by Kansas Secured Title, payable to South and Associates, for the purpose of paying off the seller's mortgage, and that this money was paid from the loan money.  Mr. Washington has asserted

conviction under this provision of the money laundering statute. First, Mr. Washington asserts that the underlying unlawful activity necessary for the money laundering charge (here, wire fraud) and the financial transaction alleged to constitute money laundering are actually the same transaction. Mr. Washington argues that the money laundering conviction is therefore precluded by the Tenth Circuit's decision in *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992). Second, he contends that the Supreme Court's decision in *United States v. Santos,* 553 U.S. 507, 128 S.Ct. 2020 (2008), precludes his money laundering conviction. In particular, he asserts that this Court should apply the plurality's holding in Santos that the term "proceeds" as used § 1956 actually means "profits," rather than "gross receipts." As explained in greater detail below, the Court concludes that the underlying criminal activity and the alleged financial transaction are not sufficiently distinct and that consequently the rule set forth in *Johnson* does compel this Court to grant Mr. Washington's Motion for Judgment of Acquittal on the money laundering count.[26]

---

that the government did not present evidence to establish that Washington realized a financial gain from the real estate transaction. However, the government did present such evidence. Specifically, Ms. Robinett testified that the Washingtons, operating as Amstar, received $ 4,329 for the sale of the Birch property.

[26] Since the Court determines that the Motion for Judgment of Acquittal must be granted under *United States v. Johnson*, the Court need not address whether the plurality's holding in *Santos* should be applied under the present circumstances. However, the Court notes that the division of the Justices in *Santos* necessitates adoption of the position taken by the narrowest view, *Marks v. United States*, 430 U.S. 188, 193 (1977), and the Court is not presented with a case of illegal gambling, such as in *Santos*. *See United States v. Darui*, 614 F.Supp.2d 25, 30 n.3 (D.D.C. 2009), *aff'd*, 2010 WL 1169787 (D.C. Cir. 2010) ("To this Court, it appears that when Justices Scalia's and Stevens' opinions are read together, Santos defines "proceeds" as "profits" only in the context of an illegal gambling operation. It does not mandate a definition in the context of defendant's alleged unlawful activity (mail fraud)").

The "specified unlawful activity" alleged here was mail fraud, in violation of 18 U.S.C. §1341.  *See United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) ("Specified unlawful activity is defined to include wire fraud") (citing 18 U.S.C. § 1956(c)(7)(A)).  According to the government, in submitting falsified loan applications, Ms. Holmes and Mr. Washington committed mail fraud, and they obtained proceeds of this illegal activity in the form of Ms. Holmes' loan.  For Ms. Holmes to receive the loan, however, the lender required that the seller's mortgage be paid off, and the loan proceeds were therefore used to send $312,617.80 to South & Associates to pay off the mortgage. The government argues that this payment of the seller's mortgage was thus made in promotion of the fraud.  However, as Mr. Washington points out, the real estate transaction could not have been completed without this payment of the seller's mortgage; consequently, these actions constitute one single act of fraud.

In *United States v. Edgmon*, 952 F.2d 1206 (10th Cir. 1991), the Tenth Circuit considered a double jeopardy challenge to a money laundering conviction under § 1956, and after reviewing the legislative history of § 1956, concluded as follows:

> "Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered.  The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity…Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity"… We find that Congress intended money laundering and the "specified unlawful activity" to be separate offenses separately punishable.
>
> *Id.* at 1213-14.

In *United States v. Johnson*, the Tenth Circuit reviewed the holding of *Edgmon*, explaining that it and *United States v. Lovett,* 964 F.2d 1029 (10th Cir. 1992), addressing § 1957, "suggest that Congress intended the money-laundering statutes to apply to transactions occurring after the completion of the underlying criminal activity." *Johnson*, 971 F.2d at 569. With regard to § 1957, the Tenth Circuit explained that Congress could have intended the statute to apply "when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity," but that the statutory language and legislative history suggested instead that "Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity." *Id.* In applying this rule, the Court concluded that wire transfers at issue in *Johnson* could not have been transactions in criminally derived property under §1957, as the same transfers were alleged to have constituted the underlying criminal activity (wire fraud). In other words, the defendant could not have engaged in money laundering where the wire transfers giving rise to the wire fraud charge were the same transfers that the government claimed qualified as a laundering transaction. As the Seventh Circuit has explained in analyzing *Johnson*, "money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). Thus, there must be a discrete predicate

crime that produced the proceeds, an act distinct from the conduct constituting money laundering.[27]

Consequently, the Court must assess whether the government has provided evidence of a "transaction meeting the statutory criteria [of § 1956] that takes place after the underlying crime has been completed." *United States v. Kennedy*, 64 F.3d 1465, 1477-78 (10th Cir. 1995). As the Tenth Circuit elaborated in *Kennedy*, "the central inquiry in a money laundering charge is determining when the predicate crime became a 'completed' offense…" *Id.* Here, the government alleges that Mr. Washington committed money laundering by using money from the loan to pay off the seller's mortgage on the property. However, as Ms. Robinett explained at trial, the payment of the seller's mortgage is a necessary step in the real estate transaction, required for the buyer to obtain clear title to the property. The "scheme to defraud" that forms the underlying criminal activity was described by the government in the Indictment as a scheme to submit false loan applications to obtain the very same home loan. Thus, the underlying criminal activity was not a distinct activity from that which the government argues constitutes money laundering. As a result, the Court concludes that the government has not presented sufficient evidence for a jury to reasonably conclude that

_____

[27] Mr. Washington actually suggests that the government impermissibly failed to prove that the proceeds from the sale of the Birch property promoted "a new and distinct criminal fraud." The Court does not understand Mr. Washington to argue, however, that the government must demonstrate two wholly separate fraudulent schemes, with the first promoting the second. Rather, despite Mr. Washington's language concerning additional criminal activity, the Court understands Mr. Washington to be arguing that there must be a money laundering transaction (which the Tenth Circuit describes as a separate criminal offense), distinct from the underlying criminal activity. As the Tenth Circuit has explained, all that is required to violate § 1956 is a "transaction meeting the statutory criteria that takes place after the underlying crime has been completed." *Kennedy*, 64 F.3d at 1477.

Mr. Washington committed the offense of money laundering, and the Court grants Mr. Washington's Motion for Judgment of Acquittal on the money laundering count.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Washington's Motion for New Trial (doc. #99) is denied and the Motion for Judgment of Acquittal (doc. #100) is granted as to Count 4, the money laundering charge, and is otherwise denied, as set forth herein.

**IT IS SO ORDERED.**

Dated this 2nd day of June, 2010, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge