**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-20107-1-JWL |
| | ) | |
| WILDOR WASHINGTON, Sr., | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

# Defendant Washington's Sentencing Memorandum

**I. Summary: Sentencing Factors Point To Leniency.**

  Defendant Wildor Washington, Sr., stands convicted by a jury of conspiracy and related charges of wire fraud and commercial carrier fraud in connection with a scheme to purchase three residential properties through a buyer making false representations to the lenders about her income and assets. According to the evidence favoring the verdict, Washington acted as the mortgage broker on at least one transaction and signed off on a loan application containing fraudulent statements about Emma Holmes's financial worth. Two loan applications from Holmes bore forged signatures of other mortgage brokers. The government charged Holmes as a co-conspirator with Washington, and she has been convicted in a separate trial.

1

Because this case has been tried and the Court has issued a detailed written opinion addressing post-trial motions, mem. ord., dct. 125, Washington will not recount the evidence pertaining to the offenses in detail here. The conspiracy took place between July and September 2004 and involved the sale of three comparatively expensive homes in Johnson County, Kansas. Three different lenders provided financing for the purchases.

The base offense level under the sentencing guidelines is 7. There is no sound basis to determining a loss enhancement under the guidelines. Accordingly, the Court should apply an enhancement based on gain realized from the conspiracy. That results in a six-level increase. The Court may also apply a two-level enhancement for obstruction, resulting in an offense level of 15. Washington has no criminal history and falls in category I, yielding a sentencing range of 18 to 24 months.

The record fails to support suggested enhancements for "sophisticated means" in carrying out the scheme or for use of "special skill" or abuse of trust. Likewise, the Court's ruling acquitting Washington of money laundering, dct. 126, precludes any enhancement on that basis.

The nature of the offense, Washington's history, and the other factors to be considered under 18 U.S.C. § 3553 all indicate the guidelines would impose too harsh a punishment. A primary consideration is Washington himself. He is a 65-

year-old veteran who has been a successful business manager and owner throughout his adult life. Apart from his involvement in this case, Washington has no criminal history. Those circumstances, when coupled with the nature of the offense here – a nonviolent, financial crime of limited duration, point toward a sentence of extended probation including an explicit requirement that Washington not work in the mortgage or real estate fields. Such a sentence would serve the ends of justice and give due consideration to the particular circumstances of this crime and this defendant.

## II. Sentencing Guidelines Applied.

### A. Role of Guidelines.

The sentencing guidelines are now just that – guidelines. But they continue to occupy a primary place in determining punishment in the sense that they mark the starting line in the sentencing process. The trial court should calculate a sentencing range under the guidelines as the foundation for measuring an appropriate disposition. *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[T]he Guidelines should be the starting point and the initial benchmark."); *United States v. Burgess*, 576 F.3d 1078, 1101 (10th Cir. 2009). As the Supreme Court has advised trial judges, the sentencing guidelines ultimately reflect only one factor to be considered in fixing an appropriate punishment. *Gall*, 552 U.S. at 49-50. (The trial court should "consider *all* of the § 3553 factors" in determining a

reasonable sentence; the guidelines range should not be given presumptive weight in that process.) (emphasis added); *United States v. Zamora-Solorzano*, 528 F.3d 1247, 1250 (10th Cir. 2008); *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). The guidelines, therefore, are no longer a singular or controlling factor. And a guidelines sentence should not be presumed reasonable. *Nelson v. United States*, ___ U.S. ___, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *Gall*, 552 U.S. at 50.

At sentencing, the trial judge, nonetheless, should determine a guideline range, and that determination provides a rough first cut or point of departure for adjustments to conform the punishment to the requirements of § 3553. Punishment, then, is to be rendered on a case-specific basis tailored to the circumstances of the particular defendant and of the wrongdoing. *See Rita v. United States*, 551 U.S. 338, 351 (2007); *Smart*, 518 F.3d at 807. While a judge ought to state reasons for especially significant deviations from the guideline range, *Rita*, 551 U.S. at 356-58, the ultimate purpose is not to fulfill some arithmetic challenge in figuring that range, but to serve the ends of justice with a punishment that truly fits the crime and the criminal, *Gall*, 128 S.Ct. at 50. *See also Smart*, 518 F.3d at 808.

**B. Base Offense Level.** Washington agrees with the presentence report that the base offense level for the crimes of conviction is 7. PSR ¶89. That determination properly takes into account grouping of the offenses and the overarching conspiracy.[1]

**C. Computing Loss: Insufficient Evidence; Court Looks to Gain as Default.**

**1. Summary.** Under U.S.S.G. § 2B1.1, governing fraud and similar economic crimes, the first enhancement to the base offense level derives from the amount of loss to the victims. Using a stair-step approach, the guidelines impose larger increases in offense level, the greater the losses. U.S.S.G. § 2B1.1(b). The presentence report substantially overstates the loss and in doing so relies on mistaken or missing information about the financial impact of the conspiracy on the victim-lenders. Because of the absence of meaningful evidence on loss, the Court should use the financial gain realized through the conspiracy to establish the enhancement.

---

[1] The presentence report treats the money laundering count as the most serious offense and, thus, as providing the controlling sentence. The guidelines, however, look to the underlying crime generating the laundered funds to establish a base offense level. U.S.S.G. § 2S1.1(a)(1). In this case, that would be wire fraud, as outlined at U.S.S.G. § 2B1.1. Although this Court has dismissed the money laundering charge, the wire fraud conviction remains the starting place for measuring the offense level.

The presentence report outlines the loss calculations in tabular form. PSR ¶67. And the report summarizes the purported losses in paragraph 70.[2] Those figures, however, do not reflect the losses (if any) to the victim-lenders and further fail to take into account appropriate fair-market valuations required under the sentencing guidelines. *See* U.S.S.G. § 2B1.1 app. note 3(E) (describing loss determinations involving recovered collateral). Those points are discussed more particularly below. In short, however, the presentence report markedly overstates the loss at $436,500 and, as a result, incorrectly imposes a 14-level enhancement. PSR ¶¶ 67, 89.

**2. Case Law on Computing Loss in Mortgage Fraud Applied.** The Tenth Circuit recently recognized that, for sentencing purposes, losses from a mortgage fraud scheme should be calculated based on the financial harm to the original lender rather than to some entity acquiring the mortgage later. *United States v. James*, 592 F.3d 1109, 1115-16 (10th Cir. 2010). The *James* Court noted that over the past decade, residential mortgages often have been sliced, diced, reformed, and repacked as derivative securities – meaning the original lenders would sell them (and the associated risk), and, in turn, they would often be resold multiple times. *Id.* A trial judge cannot determine the loss for sentencing a defendant in a

---

[2] The information contained in the table matches exactly a loss calculation the government provided to the probation office. It does not appear as if the probation office made any independent determination of the accuracy or appropriateness of that measure.

mortgage fraud scheme based on economic harm to a mortgage-holder once, twice, or multiple times removed from the original lender. *Id.* For guideline purposes, the loss should reflect the difference between the amount of the loan and what the original lender received when it sold the mortgage. *Id.* at 1116. Thus, "to the extent any original lender sustained an actual loss, that loss is the difference between the outstanding balance on the original loan and what the lender received when it sold the loan." *Id.* at 1115. What the trial judge *cannot* do is subtract the amount a downstream purchaser of the mortgage may have realized at a foreclosure sale from the amount of the original loan. *Id.* at 1115. But the government advocates precisely that impermissible method, and the presentence report follows along.

• The original lender on 7917 W. 155th St. was National City Mortgage d/b/a Commonwealth United Mortgage. PSR ¶ 67. According to the presentence report, the company disposed of the mortgage about three months later. PSR ¶ 69. At the time of foreclosure, JP Morgan Chase Bank held the mortgage. *See* Petition, ¶ 9; Journal Entry of Judgment of Foreclosure, Case No. 05CV1039, Johnson County District Court (both attached to this memorandum). There is no indication how many times the mortgage had been resold or what the terms of any such transaction may have been.

•The original lender on 15718 Birch was People's Choice Home Loan. PSR ¶ 67. At the time of foreclosure, Mortgage Electronic Registration Systems held the mortgage. *See* Petition, ¶ 9;  Journal Entry of Judgment of Foreclosure, Case No. 05CV2943, Johnson County District Court (both attached to this memorandum). There is no indication how many times the mortgage had been resold or what the terms of any such transaction may have been.

•The original lender on 7864 W. 155th St. was BNC Mortgage. PSR ¶ 67. At the time of foreclosure, Mortgage Electronic Registration Systems acting for Chase Home Finance held the mortgage. *See* Petition, ¶ 11;  Journal Entry of Judgment of Foreclosure, Case No. 05CV4783, Johnson County District Court (both attached to this memorandum). There is no indication how many times the mortgage had been resold or what the terms of any such transaction may have been.

   In sum, the information provided in the presentence report and disclosed by the government fails to provide any reasonable basis to determine the loss, if any, to the original lenders. The loss calculation made by subtracting the foreclosure sale price from the original loan amount satisfies neither the guideline requirements nor the rule in *James*. A proper calculation would look at the amounts the original lenders received upon their disposition of the mortgages.

Likewise, there is no reason to suppose the presentence report calculations in any way approximate what the original lenders got. We do not know how the mortgages were sold: Was each mortgage treated as an independent commodity and bought individually? Was each bundled with others, and the package sold for one overall price? Were they marketed in some other fashion?

**3. Fair Market Value.** We do know that ultimately each property was literally sold on the courthouse steps at a sheriff's foreclosure sale. That sort of fire sale, however, should not be used to measure loss under the sentencing guidelines. The guidelines look to fair market values in determining loss from criminal fraud. *See* U.S.S.G. 2B1.1 app. note 3(C)(i) (fair market value of the property taken should be considered in estimating loss); *id.* app note 3(E)(i) (fair market value of any property returned should be credited against loss). Nothing compelled the mortgage holders to dispose of the real property in that manner, as opposed to using a means more likely to realize a price approximating fair value. That would seem to be particularly true when, as here, the seller is not the victim of the fraud.

(Arguably, a defendant, as the wrongdoer, should bear the burden of the victim's ill-conceived choice to dispose of collateral in a commercially unproductive way. But those notions of risk allocation certainly do not carryover to an owner of a mortgage several purchases removed from the lender-victim.

Those later transactions presumably have been conducted at arms-length and reflect what the parties to them considered fair exchanges. The purchaser of a mortgage can readily inspect and independently assess the value of the real property pledged as security. If that purchaser chooses to foreclose on the property and to liquidate the asset at less than market value, that loss is far removed from the fraud.)

If the Court were to consider the fair market value of the real property as against the loan amounts, the loss on all three transactions totals $74,735:

• On 7917 W. 155th St., National City Mortgage loaned $338,252. PSR ¶ 67. According to the Johnson County Appraiser's Office, the appraised value of the property was $296,100 in 2004 and $314,000 in 2005. Since the foreclosure was initiated in 2005, that year reflects a reasonable fair market valuation. The loss would be $24,252 ($338,353 - $314,000 = $24,252). An attested copy of the Johnson County Appraiser's valuation accompanies this memorandum.

• On 15718 Birch, People's Choice Home Loan loaned $385,379. PSR ¶ 67. The appraised value was $350,300 in 2004 and $360,000 in 2005. The loss would be $25,379. An attested copy of the Johnson County Appraiser's valuation accompanies this memorandum.

• On 7864 W. 155th St., BNC loaned $391,504. PSR ¶ 67. The appraised value was $351,800 in 2004 and $366,400 in 2005. The loss would be $25,104. An

attested copy of the Johnson County Appraiser's valuation accompanies this memorandum.

Under the sentencing guidelines, a loss of $74,735 yields an enhancement of eight levels – not the 14 levels imposed in the presentence report. Accordingly, based on the loss amount, the offense level should be adjusted to 15 rather than 21.

**4. Insufficient Basis for Loss Determination.** But, as noted, even an enhancement based on fair market value presupposes proof of loss to the original lenders. There is no evidence to that effect. The presentence report contains nothing suggesting any of the original lenders disposed of their respective mortgages at a financial loss. A sentence based on that premise would be an unsupported surmise. Something more tangible is necessary in measuring punishment. Without a factual foundation for the losses to the victim-lenders, that harm-based approach cannot be used to determine an offense level. *James* 592 F.3d at 1115 (When mortgages have been sold, the prices paid for the real property at foreclosure typically lack relevance to a loss calculation "because there is no evidence suggesting those figures were a reasonable estimate of what the original lenders received when they sold the loans to the successor lenders.").

**5. Financial Gain: Alternative Measure Under Guidelines.** When no loss amount can reasonably be calculated, the Court should consider financial gain

resulting from the criminal conduct as an alternative measure to establish an offense level. U.S.S.G. § 2B1.1 app. note 3(B). Here that would be the proper course. The gain would reflect money coming into the conspiracy, as the jury necessarily found that enterprise in light of its verdict.

The $30,000 check from James and Doris Moser to Holmes would be included, since the record provides no legitimate explanation for that disbursement from the sellers to the buyer. *See* Govt. Tr. Ex. 7c (check dated Sept. 11, 2004). That payment failed to turn up on any of the closing statements or other accountings.

The payments to the mortgage brokers coming out of the loan proceeds also would be included in the gain from the conspiracy. Premier Mortgage received broker fees of $7,875 on the sale of 7864 W. 155th Street. Govt. Tr. Ex. 2c (receipts and disbursements ledger). Amstar Mortgage received broker fees of $4,320 on the sale of 15718 Birch. Govt. Tr. Ex. 3d (receipts and disbursement ledger). No fee was paid to a mortgage broker on the sale of 7917 W. 155th Street. Govt. Tr. Ex. 1c (receipts and disbursements ledger). As the Court will recall, Bennett appropriated and used without authority various company names, including Amstar. *See, e.g.,* Def. Tr. Ex. 405.

**6. Bottom Line: Six-Level Enhancement.** The total gain, then, appears to be just over $42,000, resulting in a six-level enhancement under U.S.S.G. 2B1.1(b)(1). While nothing indicates Washington pocketed any of the gain personally, that

does not alter the guideline calculation, which is based on the amount generated by the offense rather than the amount coming to a particular participating defendant. *Id.* Conversely, a trial court could consider the absence of gain to the particular defendant appearing for sentencing in determining appropriate punishment under 18 U.S.C. § 3553.

If the Court applies a loss calculation to determine the offense level, the enhancement would be eight levels. If the Court finds that inapplicable on the available record, as it ought to, it should impose a six-level gain-based enhancement. Thus, the offense level adjusted for the measurable economic impact of the fraud falls at either 15 or 13.

**D. Additional Guideline Enhancements Considered.**

The presentence report then recommends a series of additional enhancements. None is appropriate. Those enhancements (and their shortcomings) are discussed below. The order generally follows their presentation in the presentence report.

**1. Sophisticated Means Enhancement Unwarranted.** The presentence report imposes a two-level increase because the fraudulent scheme purportedly used "sophisticated means" to disguise the wrongdoing and to avert detection of the participants. PSR § 89. The enhancement is outlined in U.S.S.G. 2B1.1(b)(9) where it appears along with two other, related bases for increasing the offense level: (1) defendant relocated the scheme from one jurisdiction to another to evade

detection by law enforcement or regulatory authorities; and (2) a substantial portion of the scheme took place outside the United States. The "sophisticated means" ground takes definition from those with which it is associated in the guidelines, consistent with the common rule of construction that a word or phrase will be known by the company it keeps. *United States v. Jasso*, 587 F.3d 706, 711(5th Cir. 2009) (applying cannon of construction, often referred to as *noscitur a sociis*, to U.S.S.G. § 4A1.2); *United States v. Hays*, 526 F.3d 674, 680-81 (10th Cir. 2008) (noting with favor use of rule to construe criminal statute). In that context, the "means" refers to and requires substantial efforts to disguise the location of and the participants in the fraudulent scheme. The guideline commentary describes the enhancement as applying to "especially complex or especially intricate" conduct aimed at carrying out or concealing the scheme. U.S.S.G. § 2B1.1 app. note 8(b). It gives as examples running an on-going scheme from multiple locations, particularly in different jurisdictions, or setting up offshore accounts to hold proceeds from the scheme.

  Nothing in the alleged fraud here approaches that sort of sophistication or plotting, especially to avoid detection. The government's evidence showed that Washington appeared at two of the closings. His signature appears on the loan application for 7917 W. 155th Street indicating he had interviewed Holmes as the potential borrower. Govt. Tr. Ex. 1b. Bennett transmitted numerous documents

pertaining to the real estate transactions using her own name and providing

contact information. Govt. Tr. Exs. 2d, 3t; Def. Exs. 404, 405. In short, the

participants were highly visible, and the scheme quite simple. Holmes's income

and assets were grossly inflated on the loan applications. To support that false

income Bennett wrote up a phony lease showing rental income to Holmes. That

required filling in blanks on a standard rental agreement. According to the

government, Bennett also issued a $37,000 check to Holmes to deposit in her

credit union account to push up her liquid assets. Govt. Tr. Ex. 7a. Bennett then

stopped payment on the check before any money actually made its way into the

account. That amounts to the first (and easy) half a check-kiting scheme – hardly

an especially clever ruse.[3]

   The government has cited *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008), as

illustrative of an appropriate imposition of the "sophisticated means"

enhancement. PSR ¶¶ 176, 177. But that decision reflects a counterpoint

demonstrating why the increase should not be applied here. In *Jones*, three

individuals, two of whom worked for a bank, printed counterfeit checks on high-

deposit, high-volume accounts they identified using inside information. They

_____

[3] In a classic check kite, the perpetrator will write checks on two or more accounts
and deposit checks from one account in the others in a timed sequence so that
each deposit covers a later withdrawal before the checks clear normal banking
channels. The accounts, then, have the appearance of containing far more money
than actually has been deposited. The process typically is repeated over and over
again.

then enlisted more than a dozen people to cash the phony checks. *Id.* at 1296. The check cashers used false names, often wore disguises, and took steps to evade the bank's fingerprint identification. *Id.* at 1306. In all, the trio counterfeited more than 100 checks to loot about 30 accounts. *Id.* at 1296-97.

The fraudulent scheme charged and proven here contains nothing so elaborate. There is no basis to characterize what was done as especially complex or intricate, as the guidelines would require. It is not enough to show defendants uses false documents or made false representations. The crimes of conviction are, after all, species of fraud. False representations are a necessary component of the offense. And their presence does not provide a sufficient basis to invoke the two-level enhancement, otherwise every fraud would be so enhanced.

**2. Money Laundering Enhancement Fails Given Court's Ruling.** The presentence report calls for a two-level enhancement because the fraudulent scheme also resulted in Washington's conviction for money laundering under 18 U.S.C. § 1956. PSR ¶90. The sentencing guidelines so provide. U.S.S.G. § 2S1.1(b)(2)(B). After the presentence report was prepared, this Court granted Washington's motion to acquit on the money laundering charge. Since that conviction fails as a matter of law, the sentencing enhancement cannot be applied.

**3. No Basis For Special Skill or Breach of Trust Enhancement.** The
presentence report recommends a two-level enhancement both because
Washington supposedly used special skills in carrying out the fraud and because
he "held a position of trust relative to the borrowers who came to him for help."
PSR ¶92. Neither reason supports an enhancement.

   **a. Special Skill.** The government and the presentence report suggest that the
fraud involved special skills or knowledge warranting a two-level increase. First,
the scheme did not entail any particular expertise. The premise of the charged
conspiracy was to inflate falsely Holmes's income on the mortgage loan
applications to secure financing for the purchase of the properties. *See*
Indictment, ¶¶ 2-8, dct. 1. The purported expertise or special knowledge, then,
rests on the idea that the higher a person's income or other financial resources,
the more a bank or other financial institution is likely to loan. That concept
hovers somewhere around "smaller cars get better gas mileage" and "being
significantly overweight is unhealthy" in complexity or required expertise. They
all border on truisms. And the information or idea that income relates to
borrowing power is readily available from commonly available resources. *See,
e.g.,* "What is Creditworthiness?"

http://www.wisegeek.com/what-is-creditworthiness.htm (accessed May 29,

2010); "Too Much Debt For A Mortgage," Investopedia,

http://www.investopedia.com/articles/07/debt_to_income.asp?viewed=1

(accessed May 29, 2010) (detailed discussion of debt-to-income ratio and its

calculation, especially pertaining to real estate transactions); Weintraub,

Elizabeth, "How Much Home Can You Afford To Buy,"

http://homebuying.about.com/od/buyingahome/f/030508_Affordab.htm

(accessed May, 29, 2010) (same).

   In addition, the government suggests Washington used knowledge of debt-to-

income ratios to facilitate the scheme. That is a variation on the same theme. Each

of the cited articles also details how lenders calculate and use debt-to-income

ratios in evaluating the mortgage applications. The ratio is hardly more

profound: A lender looks at income as compared to existing debt to determine

how large an additional obligation – the mortgage – the applicant reasonable can

take on. Again, the higher the applicant's income and the lower her debt, the

more a lender is likely to loan. That, too, is a truism.[4]

---

[4] The "What is Creditworthiness?" article, for example, states: "When creditors
choose to extend credit to an individual or business, that extension of credit is
based on the understanding that the borrower will have resources that can be
used to repay the debt." And it notes that the potential lender will look at income
from a job or other regular sources in making that determination. The article also
points out a lender will be particularly interested in the overall amount of debt
the individual has as compared to her income. That's because: "By comparing
the ratio between current debt and income, it is possible to determine if the
borrower can reasonably handle another obligation without significantly
increasing the risk of default." The other cited articles contain even more detailed
discussions of those concepts, particularly the debt-to-income ratio.

The guidelines suggest the special skill enhancement may be imposed on learned professionals, such as lawyers, physicians, and accountants, when their education provides a key to the formulation or operation of a fraudulent scheme. U.S.S.G. 3B1.3 app. note 4. Likewise, jobs requiring substantial training, such as pilots or demolition experts, also come within the scope of the provision when those skills figure in the crimes of conviction. *Id.* Mortgage brokering would not seem to be of the same character as the listed fields in terms of specialized knowledge, training, or skill. Neither the government nor the presentence report offers any authority supporting use of the enhancement for a mortgage broker. The knowledge necessary to perform that job is neither abstruse nor especially difficult to acquire. And there is no showing in this case that Washington's background as a mortgage broker furnished some particularized information or skill necessary to the scheme.

The government notes that mortgage brokers are licensed in Kansas, but licensure does not equate to special skill or knowledge so much as to regulation. The guideline enhancement neither applies to all regulated or licensed fields nor uses that as a benchmark for imposing an increase in offense level.[5]

---

[5] Kansas regulates or licenses a wide array of fields, including barbering, cosmetology, private investigation, and blackjack dealing. Working in one of those jobs generally would not enough to invoke a sentencing enhancement.

**b. No fiduciary relationship or position of trust.** The presentence report suggests an enhancement should be imposed because Washington abused a position of trust that mortgage brokers hold in relation to potential borrowers they assist. Whether that might be true in the abstract (though the proposition seems somewhat doubtful), it would be inapplicable here. Holmes, the putative borrower, was charged and convicted as a co-conspirator in the fraudulent scheme. Accordingly, she could not be considered some unwitting pawn drawn into a nefarious plot, and, in turn, there could be no abuse of trust based on her interaction with Washington.

The government takes another, though equally unavailing tack by suggesting Washington, as a mortgage broker, held a position of trust in juxtaposition to the lenders. The law, however, is otherwise. The guidelines describe abuse of trust warranting an offense enhancement in terms of a managerial or executive employee taking advantage of her employer, as by a comptroller embezzling funds, or of a traditional fiduciary using that position to facilitate the crime, as by a lawyer stealing from a person for whom she serves as legal guardian. U.S.S.G. 3B1.3 app. note 1.

Tenth Circuit law hews to the guideline standards. The enhancement applies if the defendant held a "position of trust" and used that position to further the crime. *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007). The term

"position of trust" refers not to the (apparent) trustworthiness of the individual, but to executive or discretionary authority to make decisions. *Id.* The sentencing court should look at whether the defendant "had the authority to make broad case-by-case decisions for the organization." *Id.* at 1155. If so, the enhancement may be imposed assuming the defendant exercised that authority. Those considerations typically come into play when the defendant steals from her own company. *United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003); *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996). In any event, the victim must grant the discretionary authority to the defendant. *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996).

If the defendant stands in a fiduciary relationship or otherwise enjoys a personal trust relationship with the victim, the enhancement may be applied. *Koehn*, 74 F.3d at 201. Again, the point is *not* that the victim may have viewed the defendant as reliable. That alone is not sufficient, since a victim of a fraud almost invariably places some degree of trust or confidence in the perpetrator – that's the lynchpin of a successful scheme. *Id.* Rather, a defendant must otherwise hold a position the law recognizes as carrying with it a special duty or obligation of fairness to the victim. *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir. 1995) ("Something more akin to a fiduciary relationship is required [to warrant the enhancement].")

In the *Koehn*, both guideline bases – executive authority and fiduciary duty –
came into play, and the case illustrates their appropriate application. Koehn used
his executive authority to misdirect funds that had been placed with an escrow
company he controlled, while that company, as the escrow agent, held a
traditional fiduciary relationship with the victim company depositing the money.
*See Doll v. Chicago Title Ins. Co.*, 517 F.Supp.2d 1273, 1278-79 (D. Kan. 2007)
(recognizing escrow agent stands as fiduciary) (cases cited). Accordingly, Koehn
properly received an enhancement for misuse of a trust relationship.

Here, the relationship between mortgage broker and potential or actual lender
does not amount to one of special trust or fiduciary duty. They stand more as
buyer and seller of a commodity – loans for real property – and occupy
something of an adversarial relationship. The broker looks to obtain a loan
commitment for a given buyer among competing lenders. In that process, the
broker receives no compensation until the real estate transaction closes. Thus, the
broker's economic incentive lies in placing the business and obtaining a loan
commitment for the real estate buyer. The broker operates as an agent of the
buyer. The lender, of course, wants to underwrite a loan without assuming
undue risk of default (though the risk tolerance may vary depending on the loan
terms and whether the obligation later will be shopped to another entity). The

lender can and should be expected to perform its own "due diligence" to assess

that risk. The lender does not rely on the broker as its agent or fiduciary.

While a lender may accept representations made in the loan paperwork subject

to its own investigation, that does not create the sort of special bond of trust

giving rise to a sentencing enhancement under the guidelines.  As the Tenth

Circuit has held: "[I]n an ostensibly normal arms-length commercial relationship

such as this one, no trust relationship exists between the two principals."

*Brunson*, 54 F.3d at 678. *See also Jolly*, 102 F.3d at 49 ("Where fraud occurs in

arm's-length transactions not involving fiduciary-like relationships, the 'trust'

that is 'abused' is simply the reliance of the victim on the misleading statements

or conduct of the defendant."). Were the rule otherwise, any commercial

transaction involving misrepresentation or fraud would call for a two-level

increase. *Id. Cf. Edwards*, 325 F.3d at 1187 (enhancement not applicable simply

because the victim may have trusted the defendant). But that does not purport to

be the purpose or intent behind the guideline provision. As the Tenth Circuit has

stated: "In every successful fraud the defendant will have created confidence and

trust in the victim, but the sentencing enhancement is not intended to apply in

every case of fraud." *Koehn*, 74 F.3d at 201. *See also Edwards*, 325 F.3d at 1187

(same) (citing *Koehn*). Accordingly, there should be no enhancement in this case.[6]

**4. Court May Impose Obstruction of Justice Enhancement.** The guidelines call

for a two-level increase in the seriousness of the offense based on obstruction of

justice. U.S.S.G. § 3C1.1. The presentence report does not address that

enhancement. PSR ¶ 72. Based on the jury's verdict and the trial testimony, the

Court may conclude the enhancement should be applied. Washington maintains

the verdict to be erroneous, but that does not avoid the guideline application.

Here, the gist of the defense lay in Washington's lack of involvement in the

fraud. He so testified. And he pointed to Bennett (likely acting in concert with

Wildor Washington, Jr. and possibly with Holmes after his initial contact with

her) as a principal player in the scheme. The jury's verdict necessarily rejected

that defense and put Washington in the midst of the fraud. As a result, this case

falls within the scope of U.S.S.G. § 3C1.1 and would require a two-level

enhancement for obstruction.

---

[6] The government suggests *United States v. Wright*, 496 F.3d 371 (5th Cir. 2007),
requires a different result. PSR ¶ 180. But the case does not carry the weight the
government would place on it. In what the panel characterized as a "close
question," it deferred to the trial judge's findings based solely on the testimony
of a law enforcement officer at sentencing regarding the relationship between
mortgage brokers and lenders. *Id.* at 377. The panel noted that the relationship
was not a fiduciary one, but lenders "often rely to some degree on statements by
brokers in evaluating applications." *Id.* However the *Wright* court may choose to
characterize that relationship under the guidelines, the Tenth Circuit would step
back from imposing an enhancement for abuse of trust.

The government's argument for the enhancement more or less misses the forest not so much for the trees as the underbrush. The government cites several minor discrepancies in the trial evidence between Washington's testimony and what other witnesses said. Those differences have little or nothing to do with the elements of the offenses or the material issues. Because of their minor character, they easily could be the product of inadvertent mistake or misrecollection. As such, those specific instances do not justify an enhancement. Further debate on the point, however, would be academic. Taking the trial evidence as a whole, the Court would act within its discretion to impose the obstruction enhancement.

### E. Computing Guideline Range.

The final guideline offense level with adjustments is either 17, using economic loss from the fraud, or 15, using economic gain from the fraud. That is: a base offense level of 7, plus two levels for obstruction, plus either eight levels (loss to victims) or six levels (gain to conspirators) yields a final offense level of either 15 or 17. Everyone appears to agree that Washington has a criminal history of I, since he has had no significant involved in the criminal justice process other than these offenses. PSR ¶ 101 (assigning zero criminal history points and placing Washington in category I). The sentencing range under the guidelines, then, is either 18 to 24 months or 24 to 30 months. That is the first step in establishing an appropriate punishment.

### III. Fashioning Sufficient Punishment: Applying 18 U.S.C. § 3553.

Having established a sentencing range under the guidelines, the Court must then turn to 18 U.S.C. § 3553 to forge a punishment "sufficient, but not greater than necessary" to fulfill the purposes set forth there. The Court need not adhere to the guidelines recommendation if the circumstances of a particular case counsel otherwise.

#### A. Nature of Offense; Defendant's History.

The first statutory consideration looks to the "nature and circumstances of the offense" and to the "history and characteristics of the defendant." That is a broad charge. But those factors point to lenience here.

**1. The offense.** The offense is a comparatively narrow one affecting only economic interests. The conspiracy lasted about three months, from July through September 2004, and consisted of three sales of residential real estate to Holmes using fraudulently inflated income and asset statements on loan applications. The victims were commercial lenders making loans to Holmes and, in turn, taking mortgage interests in the real property. As discussed earlier, the record fails to show the extent of loss, if any, to the victim-lenders, since they all appear to have resold the loans to other commercial entities in relatively short order. The amount of money moved in the transactions was substantial, approaching

$1,000,000; the bulk of that amount was collateralized with the real property, and any loss would be a fraction of the face value of the loans.

While the conduct charged is clearly criminal and cannot be condoned, it ranks relatively low in the hierarchy of federal offenses. This was not a crime involving violence or the threat of violence to anyone. Nor did it impair the physical wellbeing of anyone, especially contrasted with crimes such as trafficking in controlled substances – contraband that can be dangerous to produce or pernicious to the body and mind of the end consumer.

**2. Defendant Washington: Considering a Life Lived.** Washington is 65 years old. He has no criminal history apart from the crimes of conviction in this case. That means he has been a law-abiding citizen for 99.6 percent of his life. Washington lived within the law for 59 years before these offenses and has continued to do so for the six years since. And he has abided by all of the bond conditions imposed on him.

But just as much to the point is the life Washington as led. Without recounting all that is in the presentence report, Washington served honorably in the U.S. Army, entering in the mid-1960s and leaving in 1973. He served in various posts and positions; he helped pioneer a program to promote race relations and equal opportunity within his division. PSR ¶ 109.  In 1973, Washington received a

commendation medal in recognition of his service and particularly his efforts to foster racial harmony. See attached letter and citation.

Following his military service, Washington held a variety of white-collar jobs mostly in the Kansas City area. He worked as a manger with Beneficial Finance Corp., Woolco, Interstate Security, Rehabilitation Loan Co., and National Credit up through about 1990. Much of that work involved credit and collection issues. Washington also worked in the mortgage/real estate field on a part-time basis during those years.

In the 1990s, he owned and operated Diversified Recovery & Locator Services Corp. in Kansas City, Kansas. Employing as many as 50 people, the company handled debt collection matters for many other corporations. *See* attached material on Diversified. When many of its larger corporate customers took their collection work in-house, Washington shutdown the business and became a fulltime mortgage broker – the field he has worked in the past 15 years. PSR ¶¶ 122-125.

But for this prosecution, Washington has led an admirable, if not exemplary life. That counts, and where it counts is in fashioning an appropriate punishment consistent with § 3553. Consideration of those life circumstances, combined with the nature of the offenses, recommends leniency and points toward a probation sentence.

The government likely will argue that Washington's crime-free life already has been taken into account through the criminal history determination of the sentencing guidelines. PSR ¶ 163 (government statement to that effect).  The government's argument simply reinforces the often mechanical operation of the sentencing guidelines. The guidelines typically attempt to reduce sentencing to a series of formulas and computations applied to a grid. In cases such as this, however, that mechanistic approach sacrifices logic and certain obvious truths. Under the government's interpretation, Washington should be treated the same as a 20-year-old who has committed his or her first offense. Both have no previous convictions and, therefore, fall in criminal history category I. For the 20-year-old, that means she has gone two years without breaking the law – the guidelines typically score only adult convictions, not juvenile adjudications. Conversely, Washington lived more than 40 years before becoming enmeshed in the criminal justice system. His would seem the better record and ought to warrant a greater measure of leniency than the 20-year-old's, especially for comparable crimes of conviction. But the government says not.

The guidelines themselves, of course, allow generally for circumstances that may not be taken into account fully under specific provisions. *See* U.S.S.G. § 5K2.0(a)(2),(3). This is such a situation. Moreover, the Court may give full consideration to those sorts of circumstances under 18 U.S.C. § 3553(a)(1).

**3. Impact of Conviction and Punishment.** The second factor under 18 U.S.C. § 3553 entails several considerations tied up in retribution and deterrence and more broadly the overall impact of the punishment. A court is to impose a just punishment on the particular defendant, taking into account specific aggravating or mitigating circumstances along with more general considerations of promotion of respect for the law and the seriousness of the offense. 18 U.S.C. § 3553(a)(2)(A).

In this case, the convictions and a sentence of probation carry heavy consequences for Washington. First, of course, there is ignominy. A lifetime's reputation of good has been lost. That is undeniably punishment: "Good name in man and woman, my dear lord, is the immediate jewel of their souls[.]" William Shakespeare, *Othello*, Act iii, sc. 3.[7]

More prosaically, as a convicted felon, Washington will be unable to work in the mortgage or lending business and any allied fields. Many other doors are now closed to him, as well. For example, his rights to vote and to hold public office have been lost. If Washington were placed on probation, his liberty would

---

[7] This should not be confused with a how-far-the-mighty-have-fallen argument, which would seem to have less moral or legal suasion. That argument suggests persons acquiring wealth or high station in life deserve leniency because of their status or position – a notion difficult to square with egalitarian principles. Here, Washington has lost his good name; that is something distinct from fame or fortune, of which he has neither, and probably is something rather more valuable.

be measurably curtailed, although not nearly so much as if he were incarcerated.
He would have to report to a probation officer regularly and would be limited in
where he could travel and who he could see. The Supreme Court has pointed out
that probation in the federal system entails real punishment. *Gall*, 552 U.S. at 48-
49. The Court could place Washington on probation for up to five years; the
maximum period would not be inappropriate.

   As federal crimes go, the charges here are comparatively less serious than most.
They are property offenses of relatively limited scope and without threat of
bodily harm to anyone. In turn, a sentence of probation would impose a
significant punishment on Washington, especially given his life circumstances. A
comparable sentence might not be appropriate for a much younger person or a
recidivist with serious or numerous past convictions. But here, the punishment
of probation, as outlined above, truly does punish. Washington would be under
those restrictions for an extended period.

   There is no mollycoddling in that sentence, and the public properly would not
view it as such or as disrespectful in some way of criminal justice process. The
Court has the discretion to impose that sort of deprivation of liberty. 18 U.S.C. §
3561(c). If the Court were to consider harsher punishment in order, a minimal
period of community corrections placement or incarceration should be viewed as
appropriate.

To the extent Washington needs some incentive to deter future criminal conduct on his part, the specter of probation revocation and imprisonment would amply serve that purpose. 18 U.S.C. § 3565(a)(2) (On a probation violation, the court may revoke and sentence in conformity with the governing statutes.) As noted, however, he has committed no criminal violations since the events charged in this case or while he has been on bond.

A court is supposed to measure the broader deterrence of a given sentence. That is, how will it affect others contemplating criminal conduct? Predicting deterrent effect is at best an inexact guessing game. Accordingly, a court should not allow that sort of speculative consideration to override its measurement of a punishment to fit the defendant standing in the dock.  And it seems unlikely that a sentence of probation here would push someone else to become an active participant in a real estate fraud scheme – a guess, to be sure.

**4. Available Sentencing Options.** The Court is not constrained in the type of sentence it may impose here. The legally available options run from probation to prison time.

**5. Weighing the Guidelines as Factor.** As noted, under 18 U.S.C. § 3553(a)(4), (5), a court considers the sentencing guidelines as a factor weighed in arriving at a statutorily proper punishment. But, as the courts have recognized, the guidelines sometimes squeeze out particularized considerations and even justice

in a quest for uniformity. In any given case, that rigidity should yield to significant facts and circumstances specific to the defendant. The result may be a decision to impose a harsher sentence than the guidelines would recommend. Conversely, a given case may warrant more leniency than the guideline calculations would tally. For the reasons already discussed, this is one of those cases for leniency, and the guidelines should be tempered to reflect the larger picture.

**6. Sentencing Disparities.** Under 18 U.S.C. § 3553(a)(6), a sentencing court should consider a punishment that avoids substantial or "unwarranted" disparities among defendants. Washington is not aware of any material disparity that would be created with other cases based on a sentence of probation. In this case, Holmes has yet to be sentenced. Accordingly, Washington is not in a position to comment on her circumstances except to say that, at a superficial level, they would appear similar.

**7. Restitution.** Finally, a court is to consider restitution in setting punishment. In this case, a restitution amount cannot be determined. The difficulty is the same here as with figuring a loss amount. In addition, there are no identifiable victims to be paid at this point. BNC Mortgage, the victim-lender on 7864 W. 155th Street, has been out of business for almost three years. PSR ¶ 68. People's Choice, the victim-lender on 15718 Birch Street, is in bankruptcy, and the trustee failed to

provide any information on losses for inclusion in the presentence report. PSR ¶ 68. National City Mortgage (now PNC Mortgage), the victim-lender on 7917 W. 155th Street, informed the presentence officer that it held the mortgage for only about three months and apparently asserts no loss. PSR ¶ 69. Based on that collective information, the Court has insufficient grounds to order restitution.

**IV. Conclusion.**

   In this case, an appropriate sentence, fashioned in conformity with the requirements of 18 U.S.C. § 3553 and taking into account the specific circumstances of the offense and Washington's history, calls for probation for five years. The terms of probation may also make explicit what the convictions will accomplish as a practical matter: Washington shall not work in the real estate or mortgage fields during the probationary period.

Respectfully submitted,

 s/ G. Gordon Atcheson
G. Gordon Atcheson
Ks. Bar No. 10916
The Atcheson Law Office
4800 Rainbow Blvd., Suite 6
Westwood, KS 66205
 (913) 362-8650
 (913) 362-8652 (fax)
gga@atchesonlaw.com

34

**Certificate of Service**

I hereby certify that on this 4th day of June, 2010 the foregoing **sentencing memorandum** was filed electronically.  Notice of this filing will be sent to counsel for all other parties appearing in the case by operation of the Court's electronic filing and notification system, thereby providing access to them.

s/ G. Gordon Atcheson