### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br>  Plaintiff, )<br>  )<br>v. )<br>  )<br>WIILDOR WASHINGTON, Sr., )<br>  Defendant. )<br>_____ ) | Case No. 09-20107-02-JWL |

### UNITED STATES' SENTENCING MEMORANDUM

Comes now the United States of America, by and through D. Christopher Oakley and Mariettta Parker, Assistant United States Attorneys, provides the following Sentencing Memorandum to the Court concerning defendant Wildor Washington, Sr.

I.  SENTENCING GUIDELINES

The defendant was convicted after jury trial of Conspiracy, Wire Fraud, Mail Fraud and Money Laundering.  The Court granted the defendant's Motion for Judgment of Acquittal on the Money Laundering Count.  The probation office has calculated the defendant's offense level at 25, based upon a loss of more than $400,000 but less than $1,000,000.  Further, the defendant has received adjustments based upon use of sophisticated means (+2 points) and utilization of a special skill (+2 points).

Further, a two-point adjustment is appropriate based upon Obstruction of Justice under U.S.S.G. §3C1.1 as a result of the defendant's decision to testify untruthfully at trial.  Therefore the defendant's guideline calculation should result in a criminal history category of I and offense level of 27, resulting in a guideline range of 57-71 months imprisonment.  A sentence within the

guideline range is appropriate.

*LOSS CALCULATION*

Loss is defined as the greater of actual loss or intended loss. "Actual loss" is the reasonably foreseeable pecuniary harm resulting from the offense. "Intended loss" is the pecuniary harm that was intended from the offense. USSG §2B1.1 Comment. n.3(A). If loss cannot reasonably be determined, a sentencing court is entitled to base the punishment on the defendant's gain. USSG §2B1.1 comment. n. 3(B). A district court's calculation of loss is reviewed under a clearly erroneous standard. *United States v. Smith*, 951 F.2d 1164, 1166 (10th Cir. 1991). Any loss information may be used as long as it is supported by a preponderance of the evidence. *Id.* USSG §2B1.1 comment. n. 3(A)(ii).

In cases where the fraud occurs in connection with collateral pledged for a loan, the defendant is entitled to a reduction in the loss amount as a result of the sale of the collateral, or the fair market value of the collateral if it has not been sold. USSG §2B1.1 comment. n. 3(E)(ii). In mortgage fraud cases, courts have generally approved the method of measuring loss by starting with the amount lent as a result of the fraud, reduced by the value of the collateral pledged at the time of sentencing. *United States v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009)(collecting cases).

"As recognized by the Guidelines, the damage wrought by fraud is sometimes difficult to calculate." *Parish*, 565 F.3d at 534 (quoting *United States v. Agboola*, 417 F.3d 860, 870 (8th Cir. 2005)). That is especially true in cases where a mortgage loan is sold

as a security before the fraud is discovered.  In *United States v. James*, 592 F.3d 1109 (10th Cir. 2010), the Tenth Circuit remanded a case for re-sentencing after the district court based its loss calculations on the face amount of the mortgage loans, less the foreclosure value of the homes put up as collateral.  The problem arose because the district court found that the Government did not prove the sale of the mortgages to a secondary lender was not foreseeable in that case, and the government failed to put on any proof of what amount the secondary lender paid for the mortgage.  Thus, there was no reasonable basis for assuming that the face amount of the mortgage represented an accurate assessment of the lenders' loss.  *James*, 592 F.3d at 1114.

The *James* panel was not unanimous in reaching this decision.  The concurrence asserted that a buyer of a mortgage will always pay at least the face amount of a mortgage, if not more, and therefore using the face amount of the loan is an acceptable measurement of loss.  *James*, 592 F.3d at 1117 n.1.  The majority was not willing to accept this proposition without proof on the record.  *James*, 592 F.3d at 1116 n.5

The concerns raised in *James* are not present here.  The defendant's testimony established his expertise in the mortgage industry, a fact emphasized in his sentencing memorandum, which points out his fifteen year involvement in the industry (See Def's Sentencing Memorandum at 28).  The evidence in this case makes it abundantly clear that the defendant was on notice that the loans could be sold to other lenders.

In fact, the mortgages signed by Emma Holmes each contain a provision, paragraph 20, that disclosed that the loans could be sold and/or serviced by another

3

institution. (See Exhibit 1g, 2k, and 3r)  Emma Holmes placed her initial underneath the provision.

Because the loss by the successor lenders was reasonably foreseeable, considering their loss is appropriate under *James*. "So long as that harm (successor lender's loss) is reasonably foreseeable, it is properly considered actual loss under the Guidelines." *James*, 592 F.3d at 1116, footnote 4.

Further, as it relates to 7917 W. 155th Place, although the loan was sold, the successor lender required National City Mortgage to "buy back" the loan, and therefore, the original lender borne the loss ($176,974.83).

Therefore, the loss calculation should be the difference between the loan amount, minus any payments toward the principal, minus the amount received by the successor lender at the time of final sale after foreclosure.

The defendant's suggestion that gain should be used, instead of loss, is flawed because as stated above, a reasonable loss calculation is able to be made. However, should the Court decide to use gain as the calculation, the defendant's estimate severely under-reports the gain. The defendant has only considered the gain to the charged conspirators. However, the evidence establishes that the sellers of the three were also involved in the conspiracy. As a result of the three sales of houses that were in foreclosure the sellers received $146,882.12[1] from closing. The breakdown of their

---

[1] This calculation ignores the $35,000 received by Emma Holmes "under the table" because presumably she was paid we the proceeds received by the Mosers, portions of which were presumably funneled to the Washingtons, as evidence by the fake invoices submitted to the closer, but which were not paid. (See Gov's Ex. 3T for instance).

4

receipts paid at closing to either the broker (excluding payments for credit reports), the seller or Emma Holmes is as follows:

      7917 W. 155th Place (Exhibit 1c) –  $39,490.34 (Mosers)
      7864 W. 155th Place (Exhibit 2c) -  $48,802.16 (Robin Williams)
                                                          $5,000.00 (Mosers)
                                                          $7,775.00 (Premier Mortgage)
      15718 Birch (Exhibit 3d)-         $4,320.00 (Amstar Mortgage)
                                                          $1,540.00 (St. Lukes on behalf of Holmes)
                                                          $39,954.62 (Mosers)

*The Defendant's Suggested Use of County Appraisal Documents is Flawed and Inappropriate.*

In his Sentencing Memorandum, the defendant suggests that the appropriate method to be used in determining the value of houses at the time of foreclosure is Johnson County's appraised value at the time of foreclosure. (See Def's Sent. Memo at 10-11). However, this method is flawed, due in large part to the fraud perpetrated by the defendants.

Evidence will be presented at sentencing that the appraisals for each of these three houses was conducted by Lanny Ross, who was convicted as part of mortgage fraud conspiracy involving the defendant's son, Wildor Washington, Jr. As in Washington Jr's conspiracy, the appraisals in this case were inflated, and not true estimates of the value of the houses. Therefore, the prices paid by Emma Holmes, which were intended to suck as much money from the houses into the pockets of the conspirators, were grossly inflated. The Johnson County Appraiser, consistent with standard county appraiser practices, would have been required to consider the

artificially inflated sales price of the scheme. K.S.A. 79-503a states that previous sales, along with other criteria, is to be considered and defines "fair market value" for tax valuation purposes as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." See also *Board of County Commissioners of Shawnee County v. Brookover*, 198 Kan. 70, 77 (Kan. 1967) "The sales price of real estate given by a willing purchaser to a willing seller is substantial evidence of the value of such real estate for appraisal purposes, although it may be proper to consider other factors mentioned in K.S.A. 79-503 such as inflation."

The defendant urges that considering the foreclosure sales price is inappropriate because a sheriff's sale is a "fire sale" resulting in artificially low prices. Sheriff's sales are routinely recognized as the proper method to dispose of property after foreclosure to protect both the foreclosing lender's rights and the rights of the borrower *(See Prairie State Bank v. Superior Housing, Inc.* unpublished, 2004 WL 375999 (Kan. Ct. App. 2004). However, in this case the successor lender or its representative purchased the houses at the sheriff's sale, bidding what was owed at the time of sale. They then sold the houses, at a loss, on the open market. It is this price, the subsequent sale, which is appropriately used in determining loss – the successor lending institution had the incentive to obtain as much money as reasonably available at the sale.

The United States will present evidence at sentencing in support of its loss

calculation. An appropriate loss calculation should include costs incurred as a result of the foreclosure process, but not interest, finance charges, and late penalties. U.S.S.G. §2B1.1, app. note 3(D).

*Sophisticated Means*

A two point enhancement for "sophisticated means" is appropriate under U.S.S.G. §2B1.1(b)(9)(C). As argued on page 38 of the presentence report in the Government's response to the defendant's objection, *United States v. Ratliff*, 2010 WL 1645144 (10th Cir. 2010), decided April 26, 2010, supports the enhancement, along with *United States v. Wright*, 496 F.3d 371 (5th Cir. 2007) and *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008), all of which are discussed in the response.

Additionally, *United States v. Small*, 2006 WL3720253 (10th Cir. 2006) supports the enhancement. Small, a mortgage broker concocted two schemes, one which utilized "investors" to submit materially false mortgage loan applications to lenders. The district court applied the sophisticated means enhancement, based upon Small's use of shell companies, fraudulent financial statements and other false statements. Small, similar to the Mr. Washington, argued that his scheme was not especially complex, and argued that "the enhancement is designed to cover a strictly limited subset of fraud offenses and requires the level of means sophistication to be much higher than average for that type of offense[2]." *Id* at 6. The defendant, like Small, conveniently ignores the

---

[2] Washington argues "Nothing in the alleged fraud here approaches that sort of sophistication or plotting, especially to avoid detection." (Def's Sent. Memo at 14).

7

remainder of Application Note 8, which states, "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  The *Small* Court held, "We agree that Mr. Small's conduct, which employed such devices as shell corporations, false financial statements and fictitious persons, plainly falls within the definition of "sophisticated." ...[W]e think that this case was tailor-made for a sophisticated means enhancement even though the fraud was readily detectible once the pieces of the puzzle were put together."  *Id.*

*Special Skill/Breach of Trust*

An additional two point enhancement is appropriate under U.S.S.G. §3B1.1 for either use of a special skill or abuse of position of trust.

The defendant testified concerning his knowledge of the mortgage industry, especially as it relates to "stated" loans, which are so complex that the defendant testified that he had to explain stated loans to IRS Special Agent Herron.  Further, Special Agent Herron testified that the defendant utilized his knowledge of the mortgage industry since, the defendant told Agent Herron, he knew that lenders had a database which told them what salary range was appropriate for certain occupations.

Should the Court not find the special skill enhancement is appropriate, two points should still be added under §3B1.1 based upon the defendant's abuse of his position of trust as a mortgage broker.  At trial Lynn Rowland and Kim Fine, representatives from the lender, testified concerning the reliance placed upon the

information provided by mortgage brokers they contract with.

Page 39 of the presentence report contains the Government's response to the defendant's objection to this enhancement. The objection contains a lengthy quotation from *United States v. Wright*, 496 F.3d 371, 377 (5th Cir. 2007) and citations to *United States v. Septon*, 557 F.3d 934 (8th Cir. 2009) and *United States v. Fiorito*, 2010 WL 1507647, April 14, 2010 (D. Minn) which all support the finding of a position of trust between mortgage broker and lender. (But see *United States v. Dinnall*, 2009 WL 405365(11th Cir. 2009), finding, based upon testimony of Lynn Rowland[3] that a position of trust exists between lender and broker, but not loan originator who works for the broker[4].

*Obstruction of Justice*

As argued in the Presentence report, and acknowledged by the defendant in his sentencing memorandum, a two point increase for obstruction of justice under §3C1.1 is appropriate based upon the defendant's false testimony at trial.

## II. DEFENDANT'S 18 U.S.C. §3553 ARGUMENTS

The defendant argues that the factors of §3553 support a variance. However, the factors identified by the defendant are either not compelling, or have already been taken into account in the Guidelines calculation

*Seriousness of the Offense*

The defendant minimizes the seriousness of the crimes he committed. "The offense is a

---

[3] Rowland, Vice President, National City Mortgage, testified at trial in this case.

[4] The *Dinnall* Court also found that the loss under the Guidelines should be the amount of the loan, in Dinnall's case $800,000, despite the lender losing only slightly more than $8,000.

comparatively narrow one affecting only economic interests." (Def's Sent. Memo at 26) Later, he says, "[w]hile the conduct charged is clearly criminal and cannot be condoned, it ranks relatively low in the hierarchy of federal offenses." (Id at 27) Finally, "[a]s federal crimes go, the charges here are comparatively less serious than most.  They are property offenses of relatively limited scope and without threat of bodily harm to anyone." (Id at 31).  Probably not surprisingly, the United States takes exception.

Ignoring the nationwide economic impact of mortgage fraud schemes across the country, of which the defendant was a very small part[5], the defendant's criminal conduct had a very real impact on this community, beyond  the loss to the lender and its successors.  Mortgage fraud does not occur in a vacuum and the defendant's conduct reaches beyond the immediate parties involved in the residential real estate transactions.  For instance, home values in neighborhoods can be artificially and unfairly inflated when other houses in the neighborhood are subject to fraud.  This is because appraisers often utilize "comparable" houses to help estimate value, and as discussed earlier, taxing entities often use house sales to set valuation for houses and for similar properties in the same neighborhood.  Further, the foreclosures caused by mortgage fraud often results in shuttered properties and properties left in disrepair.  As evidenced in the defendant's case[6], mortgage fraudsters often target houses in the same neighborhood, because it is easier to obtain and/or justify inflated appraisals when other values  in the neighborhood were previously artificially inflated.  The defendant's crimes were serious, and deserving of an

---

[5] The Federal Bureau of Investigation reports national losses attributable to mortgage fraud at $4 to $6 Billion annually.  See http://www.fbi.gov/hq/mortgage_fraud.htm, (as visited June 5, 2010.)

[6] Two of the three houses in this case were located on 155th Place, owned by James Moser.  Another house on that block was the subject of another fraudulent transactions in the Wildor Washington, Jr case.

appropriately severe sentence..

*Defendant's lack of criminal history*

The defendant's lack of criminal history has been taken into account in the Guidelines calculation and he has received the benefit through his calculated criminal history category of I. Further, both the presentence report, through the identification of the factors that may support departure, and the defendant in his sentencing memorandum, make an argument that the defendant's criminal conduct is an anomaly when one looks at the rest of his life. The Guidelines, at §5K2.20 allow for a downward departure for aberrant behavior. The Guidelines state that a departure for aberrant behavior is appropriate, "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."

Clearly, the factors set out at §5K2.20(b), which are required for a departure based on aberrant behavior, do not apply. There was not only one transaction, the scheme required significant planning, and the scheme lasted from the time the defendant traveled to St. Louis to use Amstar until closing on the last house months later.

As the defendant has argued, since the guidelines are advisory, the Court is not bound by their strict application. However, the Guidelines' recognition that a defendant's argument that he should be sentenced less severely because of his otherwise conviction-free past should be weighed against the length and complexity of his criminal conduct makes sense. How can the defendant argue that his criminal conduct was an anomaly when it lasted nearly a year?

*Appropriate Punishment*

The §3553 factors require the Court to consider a sentence which promotes respect for the law, and provides just punishment to the defendant. The defendant argues that the loss of his "good" reputation is punishment. However, the defendant testified that he had previously been barred the mortgage business as a result of conduct of his son, Bill Jr. Despite this, he voluntarily joined Bill Jr again, shared office space with him, and came together to effect this scheme. The defendant clearly was not concerned with his reputation during the course of this scheme.

**CONCLUSION**

A sentence within the Guidelines is appropriate. The defendant entered into a conspiracy with others including his son, who the defendant, by his own admissions, knew to be a shyster. He engaged in criminal conduct that caused substantial loss not only to the lender and its successors, but also to the community in general. A guidelines sentence of imprisonment will reflect the seriousness of the offense, promote respect for the law and afford adequate deterrence to criminal conduct.

RESPECTFULLY SUBMITTED,

Lanny D. Welch
United States Attorney

s/ D. Christopher Oakley
D. CHRISTOPHER OAKLEY
Assistant U.S. Attorney
500 State Avenue
Kansas City, Kansas 66101
(913) 551-6730
KS S. Ct. No. 19248

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 7th day of June, 2010, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record, including the following:

G. Gordon Atcheson
Attorney for Defendant Washington
4800 Rainbow Blvd, Suite 6
Westwood, KS 66205

                                                                <u>s/ D. Christopher Oakley</u>
                                                                 D. Christopher Oakley
                                                                 Assistant U.S. Attorney